IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SANDY JO H., individually and as guardian of COLBY W. and M.W., minors,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>CIGNA BEHAVIORAL HEALTH, and THE INTERVENTION INC. MEDICAL BENEFIT PLAN,<br><br>Defendants. | ORDER AND<br>MEMORANDUM DECISION<br><br><br><br>Case No. 2:17-cv-00110-TC |

Plaintiff Sandy Jo H. (Sandy) enrolled her son M.W. and daughter Colby W. in Diamond Ranch Academy, a residential care facility in southern Utah, because of their behavioral problems. Her insurance plan, the Intervention Inc. Medical Benefit Plan, and its claim administrator, Cigna Behavioral Health (Cigna), determined that residential treatment was not medically necessary for either child and refused to cover the costs of treatment. Sandy appealed to an independent review organization, which agreed with Cigna's determinations. Sandy now appeals to the court. Reviewing for abuse of discretion, the court finds that Cigna's determinations were reasonable and denies Sandy's Motion for Summary Judgment.

## BACKGROUND

### The Intervention, Inc. Medical Benefit Plan

Sandy's employer, Intervention, Inc., established its Medical Benefit Plan (the Plan) for eligible employees and their dependents. Sandy is a participant in the Plan, and M.W. and Colby are covered dependents. The Plan grants Cigna, its claims administrator, "discretionary authority to determine whether a claim should be paid or denied on appeal and according to the Plan provisions." (Admin. R. at Plan 6.)[1]

The Plan only covers services that are medically necessary, and gives the following medical necessity criteria for behavioral health and substance use disorders:

> Except where state law or regulation requires a different definition, "Medically Necessary" or "Medical Necessity" shall mean health care services that a Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> (a) Required to meet the essential health needs of the patient;
>
> (b) Consistent with the diagnosis of the condition for which they are required;
>
> (c) Consistent in type, frequency and duration of treatment with scientifically-based guidelines as determined by medical research;
>
> (d) Required for purposes other than the convenience of the provider or the comfort of the patient;
>
> (e) Rendered in the least intensive setting that is appropriate for the delivery of health care.

---

[1] The administrative record in this case consists of three parts, each separately Bates-numbered: the Plan documents, numbered with the prefix "Sandy H. (Plan)" (ECF No. 19-4), the record for M.W.'s claim, numbered with the prefix "Sandy H. (MW)" (ECF Nos. 19-2 & 19-3), and the record for Colby's claim, numbered with the prefix "Sandy H. (CW)" (ECF No. 19-1). Citations to the record here will use the abbreviated prefixes "Plan," "MW," and "CW."

(Id. at Plan 173.)

The Plan also gives criteria for admission into a residential treatment facility:

**All of the following must be met:**

1. All basic elements of medical necessity must be met.

2. **One or more of the following criteria must be met:**

    A. The child/adolescent has been diagnosed with a severe psychiatric disorder that is pervasive and significantly impairs developmentally appropriate functioning. This impairment in function is seen across multiple settings such as; school, home, and in the community, and clearly demonstrates a need for 24-hour supervision and active treatment, OR

    B. Immediate prior treatment in a more intensive level of care (such as mental health inpatient) has resulted in an acceptable degree of stability. However, the child/adolescent continues to display behaviors that require around-the-clock supervision in a structured setting in order to maintain the safety of the child/adolescent and others.

3. **All of the following criteria must be met:**

    C. The child/adolescent and/or family demonstrate chronic dysfunction, which is likely to respond to multiple therapeutic and family treatment interventions, and all parties commit to active regular treatment participation.

    D. The child/adolescent is able to function with age appropriate independence, participate in structured activities in a group environment, and is capable of developing the skills necessary for functioning outside of the residential program.

    E. Less restrictive or intensive levels of treatment are not appropriate to meet the individual's needs or have been tried and were unsuccessful.

(Id. at Plan 175 (boldface in original).)  Additionally, the Plan lists "Admission Considerations,"

including whether, before admission, "there has been a face-to-face assessment with the

child/adolescent and family to determine if this level of care is medically necessary and clinically appropriate." (Id. at Plan 174.)

If Cigna denies coverage for treatment, the Plan has two levels of review. First, a claimant may file an internal appeal with Cigna. Second, if dissatisfied with Cigna's decision on appeal, a claimant may request an external review by an independent review organization, or IRO.

**M.W.'s Admission to Diamond Ranch Academy**

M.W.'s behavioral problems began at a young age. From ages four to eight, he experienced recurring episodes of rage that led to his being sent home from day care, his suspension from first grade, and several inpatient hospitalizations at Nachtaug Hospital in Connecticut. During one such episode, at age five, M.W. tried to stab another child in the neck with a pair of scissors. While hospitalized, doctors diagnosed and treated M.W. for bipolar disorder, attention deficit/hyperactivity disorder, oppositional defiant disorder, and frontal lobe seizures.

M.W. continued to struggle in elementary school. In 2006, at around age seven, M.W. was placed in Nachtaug Hospital's outpatient school called Hickory Street. While there, he attempted to stab a therapist with a pencil and was again hospitalized. In November 2007, he was transferred to Meridell Children's Hospital in Texas, where he continued inpatient treatment and therapy until March of 2008. From 2009 to 2012, M.W. attended Stott Elementary School, where he again experienced outbursts of rage. During one instance, he tried to climb out of the window of a moving bus. During another, he ran out of school and across busy streets until caught and restrained by police.

After M.W. ran away from school, his doctor changed his medication. By Sandy's account, the change worked. But M.W.'s behavioral problems returned in 2013. According to Sandy, M.W. "again became physically aggressive, verbally abusive and refused to take his medication." (Admin. R. at MW 119.) He threatened to kill Sandy and Colby when angry, and, at one point, broke a door frame and door when Sandy refused to allow him to go to a late movie for his fourteenth birthday.

On August 25, 2013, Sandy enrolled M.W. into residential treatment at Diamond Ranch Academy. In his initial psychosocial assessment, M.W. reported to his interviewer that he struggled with anger, and "was sent to [Diamond Ranch Academy] for fighting with his family." (Id. at MW 723.) The assessment noted that he was not behind in school.

In a subsequent psychological evaluation, Dr. C.Y. Roby noted a number of diagnostic impressions, including oppositional defiant disorder, disruptive behavior disorder, a parent-child relational problem, and learning disorders. Diamond Ranch Academy developed a treatment plan for M.W. that identified his primary problem as oppositional defiant disorder and secondary problem as anger management.

M.W. completed treatment at Diamond Ranch Academy on August 1, 2014. His discharge summary noted "great strides in many of the issues that brought him to the program[,]" including the ability to control his anger, healed relationships with his parents, and improved self-esteem and confidence. (Id. at MW 509.)

**Claim for Benefits for M.W.'s Residential Treatment**

On May 19, 2014, Diamond Ranch Academy called Cigna to request a retroactive medical necessity review for its ongoing treatment of M.W. On May 29, 2014, Dr. Alvin Blank,

a psychiatrist employed by Cigna, reviewed Diamond Ranch Academy's records for M.W. and determined that residential treatment was not medically necessary for three reasons.

First, Dr. Blank determined that, based on the records, M.W.'s symptoms did not meet the Plan's medical necessity requirement for residential treatment. M.W. did not demonstrate acute symptoms at Diamond Ranch Academy "other than periodic anger on the phone with [his] mother and irritation [with] peers." (Admin. R. at MW 22.) He "did not have a severe psychiatric disorder that was pervasive and resulting in significant impairment in multiple settings and clearly demonstrates a need for 24-hour supervision and active treatment." (Id. at MW 23.)

Second, Dr. Blank determined that Diamond Ranch Academy did not meet the Plan's requirements for a qualifying residential care facility because it "does not have a multidisciplinary team led by a board certified/eligible psychiatrist, and there is no evidence that there was a nurse or psychiatrist on site 24/7 to assist with medical issues, crisis intervention, or medication administration, when needed." (Id.)

Lastly, Dr. Blank concluded that "[l]ess restrictive or intensive levels of treatment were appropriate and available." (Id.) He identified outpatient treatment as the appropriate level of care. On May 29, 2014, Cigna sent a letter to Sandy and Diamond Ranch Academy denying coverage on these three grounds.

On November 19, 2014, Sandy internally appealed Cigna's denial. She contended that Diamond Ranch Academy did in fact meet the Plan's criteria for a residential treatment facility, and that M.W.'s psychiatric disorder warranted residential treatment—that it was severe, pervasive, and resulted in significant impairment. In support of the latter contention, Sandy

included her own narrative summary of M.W.'s behavioral problems and treatment history, as well as Dr. Roby's psychological evaluation and earlier medical records from Meridell.

Dr. Mohsin Qayyum, another Cigna psychiatrist, reviewed Sandy's internal appeal and upheld Dr. Blank's denial of benefits. Dr. Qayyum did not address whether Diamond Ranch Academy qualified as a residential treatment facility. Instead, he upheld the decision because M.W. failed to meet the Plan's medical necessity requirements:

> [M.W.] did not have a severe psychiatric disorder that was pervasive and that significantly impaired [his] daily functioning in home, school, and community; neither did [he] require continued mental health treatment in a 24-hour structured setting immediately after having had active treatment in an acute inpatient psychiatric facility. Less restrictive or intensive levels of treatment were appropriate and available.

(Id. at MW 18.) On December 18, 2014, Cigna sent Sandy a letter repeating Dr. Qayyum's conclusion and denying her appeal.

Sandy then requested an external review. On June 16, 2015, MES Solutions, Inc. (MES), the independent review organization, upheld Cigna's denial. MES found that Diamond Ranch Academy did not meet national standards of care for residential treatment centers because psychiatrists did not meet once a week or more with M.W. MES also found that residential treatment was not medically necessary:

> It does appear from the records the patient cannot live with his family however, that is not equal to the patient requiring treatment or meeting criteria for treatment at the residential level of care. . . . The patient did continue to present behavioral problems but these are problems that could have been addressed at a lower level of care than a residential treatment center, given his symptoms.

(Id. at MW 104–05.)

**Colby W.'s Admission to Diamond Ranch Academy**

Colby, M.W's older sister, began experimenting with drugs and alcohol in seventh grade. In tenth grade, she used marijuana and ecstasy five days a week, and would sneak drinks of her mother's wine. In 2013, during her junior year of high school, she drank alcohol three to five days a week and began using mushrooms, LSD, and cocaine. Sandy reported that Colby would drive while high and drunk, and would become aggressive when Sandy stopped her from leaving the house to find drugs or alcohol.

On June 23, 2014, Sandy called Cigna to seek authorization for residential treatment for Colby. Cigna did not authorize the treatment, but rather offered to connect Sandy with a clinician (Sandy declined), and informed Sandy that the residential treatment facility must call Cigna with clinical information. Nonetheless, Sandy enrolled Colby at Diamond Ranch Academy the next day. According to Sandy, she "had no option but to take such a drastic intervention…[Colby] was killing herself with alcohol use and drug addictions." (Admin. R. at CW 47 (ellipsis in original).)

Diamond Ranch Academy interviewed Colby for a psychosocial assessment on the day of her admission. Colby understood that her mother sent her to Diamond Ranch Academy "because of a 'drug problem and disobedience.'" (Id. at 114.) The assessment noted that Colby was not behind in school, and that she reported receiving good grades. Colby told her interviewer that she drank alcohol two to three times a week in the summer, used marijuana four times a day, and had used LSD three times since she was sixteen years old (she was then seventeen). Colby also told her interviewer that she first had thoughts of suicide at seven years of age, though she last thought of suicide when she was sixteen. She did report current problems with anger.

Early psychotherapy notes confirmed that Colby was not in fact suicidal. She reported "no current or recent homicidal or suicidal ideation[,]" and showed "no signs . . . of risk of self harm." (Id. at 205.) Diamond Ranch Academy removed Colby from suicide watch the day after her admission. And while Colby began therapy for depression, anxiety, and chemical dependence shortly after her admission, a medical evaluation from August 19, 2014 noted "no clinically significant depression or anxiety." (Id. at 165.)

On September 22, 2014, while at Diamond Ranch Academy, Colby underwent a psychological evaluation by Dr. Roby. Dr. Roby listed a number of diagnostic impressions, including depression, substance abuse, oppositional defiant disorder, disruptive behavior, and family relationship problems. and recommended residential treatment:

> Colby will most likely benefit from a multi-modal treatment approach designed to address her problems in school, home, and society. Colby, [sic] Colby should receive individual therapy that is supportive, confrontive, goal-oriented, and focused on restructuring the maladaptive thinking patterns that are associated with her depression, aggressive acting out, anger, and substance abuse. Indeed, a predictable environment where positive and negative consequences can immediately and regularly follow any adherence to or violation of rules would be ideal….Such an environment is most easily provided in a residential treatment placement much as the one in which Colby is currently enrolled. Therefore, premature termination of involvement in a residential program is ill advised. A brief cognitive-behavioral treatment (CBT) protocol that is highly structured with clear long and short-term goals would likely be most effective given her current level of impairment.

(Id. at 74.)

Colby completed treatment at Diamond Ranch Academy on April 21, 2015.

**Claim for Benefits for Colby W.'s Residential Treatment**

On June 27, 2014, Diamond Ranch Academy called Cigna to retroactively request approval for Colby's treatment. After reviewing Diamond Ranch Academy's records for Colby, Cigna denied coverage. Cigna noted that the records did not show "current [risk of harm] or [substance abuse] issues that appear to need dual [residential treatment care] at this time." (Admin. R. at CW 14.) Dr. Narendra Patel, a Cigna physician, separately concluded that Colby did not require residential treatment "as there is insufficient clinical [information] at the present time to determine and justify medical necessity for the request." (Id. at CW 12.) In its June 30, 2014 denial letter, Cigna stated that, "[b]ased on the available information, [Colby's] symptoms do not meet the medical necessity criteria" of the Plan for residential treatment. (Id. at CW 226.)

Diamond Ranch Academy requested an expedited internal appeal of Cigna's decision. Dr. Stuart Lustig, another Cigna physician, reviewed Colby's records from Diamond Ranch Academy and spoke with Jonathan Parker, a Diamond Ranch Academy social worker. According to Mr. Parker, police had detained Colby just before her admission to Diamond Ranch Academy because of a "verbal altercation," and Sandy said that the police thought she was at risk for suicide. But Dr. Lustig noted that Colby's mental health diagnosis was "unclear"—she was diagnosed with mood and anxiety disorders, and demonstrated "some [oppositional defiant disorder] behavior," yet "she has not had a psychiatric assessment, not even with a psychiatric nurse practitioner, and a psychiatrist is not available at this facility." (Id. at CW 8.) Dr. Lustwig and Mr. Parker "discussed that there's insufficient information available, even after 6 days at this facility, to determine why residential care would be required." (Id.)

On July 1, 2014, Cigna issued a letter upholding its denial of coverage because of insufficient clinical information: "[a]uthorizations are based upon medical necessity which is determined by up-to-date clinical information. In the absence of such information, authorizations cannot be made." (Id. at CW 22.) On the same day, a Cigna representative spoke by telephone with Sandy about its appeal decision. The representative explained that Cigna typically used psychological assessments to determine the proper level of care. According to Sandy, police had told her Colby was suicidal and needed long-term residential treatment, and Colby refused to undergo a psychological assessment, so she was enrolled at Diamond Ranch Academy immediately.

On October 24, 2014, Sandy requested an external review of Cigna's coverage decision. Her appeal letter included a narrative summary of Colby's behavioral problems and substance abuse. She also included Diamond Ranch Academy's records regarding Colby and Dr. Roby's September 22, 2014 psychological evaluation.

MES conducted the external review, and on January 12, 2015, it upheld Cigna's decision. In its determination letter, MES noted that Colby did not meet the criteria for residential treatment. She was not suicidal upon admission. Her psychological evaluation with Dr. Roby "did not point towards any clinically significant depression or anxiety." (Id. at CW 36.) And her treatment at Diamond Ranch Academy—equine therapy and group and family therapy—could be done on an outpatient basis. MES concluded that "[i]t is likely that a combination of community based interventions would be as safe and effective as residential treatment and need to be tried first prior to removal from the home and focus on residential treatment." (Id. at CW 36–37.)

Having exhausted her administrative appeals, Sandy brought this action pursuant to ERISA's judicial review provision, 29 U.S.C. § 1132(a)(1)(B), challenging Cigna's denial of coverage for both of her children.

**STANDARD OF REVIEW**

In an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation omitted).

A court reviews claims brought under 29 U.S.C. § 1132(a)(1)(B) de novo unless the underlying benefit plan gives the claim administrator "discretionary authority to determine eligibility benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the plan gives discretionary authority, the court uses the abuse of discretion, or arbitrary and capricious, standard.[2] Id.; see also Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1189 (10th Cir. 2007), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). This latter standard of review is deferential—a decision to deny benefits "will be upheld so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006). "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one." Id.

---

[2] The Tenth Circuit, in reviewing ERISA cases, uses the terms "abuse of discretion" and "arbitrary and capricious" interchangeably. Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010 n.10 (10th Cir. 2008).

Under the arbitrary and capricious standard of review, a court considers both the terms of the governing plan and the weight of evidence in the record. A court must determine whether the plan administrator's interpretation of the plan was "reasonable and made in good faith." Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir. 2002). It must also ensure that substantial evidence supports the denial of benefits. Graham v. Hartford Life & Accident Ins. Co., 589 F.3d 1345, 1358 (10th Cir. 2009). "Substantial evidence" means "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker." Id.

The parties disagree about the standard of review. Sandy acknowledges that the plan gives Cigna discretionary authority to determine eligibility for benefits. (See Pl.'s Mot. Summ. J. and Mem. in Supp. (Mot.) at 20–21, ECF No. 22; Admin. R. at Plan 114–18.) But she argues that procedural irregularities nonetheless warrant de novo review.

A plan administrator can forfeit arbitrary and capricious review if it fails to satisfy ERISA's claim procedure regulations—typically deadlines for making benefits determinations. See Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 634–35 (10th Cir. 2003). But this is not a "hair-trigger rule." Id. at 635. As long as a plan administrator substantially complies with ERISA's procedural regulations—that is, any irregularities are "inconsequential" and "in the context of an ongoing, good faith exchange of information between the administrator and the claimant"—it will retain deference. Id.

According to Sandy, four procedural irregularities warrant de novo review here. First she asserts that Cigna and MES denied M.W.'s claim based on three different, "inconsistent" rationales. (Mot. at 25.) She points specifically to Cigna's internal appeal decision, which did

not address Cigna's initial determination that Diamond Ranch Academy failed to qualify as a residential treatment center. Yet Cigna's decisions initially and on appeal, as well as MES' external review decision, denied coverage because reviewers determined M.W.'s residential treatment was not medically necessary. While Cigna may have abandoned that alternate ground for denying coverage, its medical necessity rationale was consistent throughout the review process, and independently upheld by MES.

Next, Sandy asserts that Cigna's internal appeal determination for M.W.'s claim did not comply with 29 C.F.R. § 2560.503-1(h)(2)(iii), which requires claimants be provided, upon request, "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." Sandy's appeal letter requested that, should Cigna deny her appeal, it "provide specific references to the clinical records that support [its] determination (i.e., how does the clinical record fail to meet each clinical criterion for residential treatment?)." (Admin. R. at MW 127.) Cigna's determination letter did not refer to M.W.'s clinical records.

But Cigna's determination letter complied with the applicable ERISA regulation, 29 C.F.R. § 2560.503-1(j). Cigna included in its letter the specific reason for its denial of coverage, reference to the Plan's medical necessity criteria for residential treatment, and a description of the available external review procedure. It also stated Sandy's right to receive, "upon request, copies of all documents, records and other information relevant to your claim for benefits." (Admin. R. at MW 362.) See 29 C.F.R. § 2560.503-1(j)(3). Sandy did not avail herself of the offer. Her argument here, depending on what she views as an insufficient appeal response, does not rise to the level of a serious procedural irregularity. And even construing her appeal letter as

14

a request under subpart (h)(2)(iii), Cigna's compliance with subpart (j)(3) renders any error inconsequential and in the context of the ongoing, good faith appeal process. See Gilbertson, 328 F.3d at 635.

Third, Sandy argues that Cigna violated ERISA regulations by failing to request additional information about Colby before concluding that "there is insufficient clinical at the present time to determine and justify medical necessity for the request." (Admin. R. at CW 226.) According to Sandy, the denial notification should have included "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary" under 29 C.F.R. § 2560.503-1(g)(1)(iii).

The record shows, however, that Cigna did not deny coverage because it lacked available information, but because the existing information did not justify residential treatment. At the time Cigna made its initial determination and conducted its expedited internal review, Colby had not yet undergone a psychological assessment typically used to determine the necessary level of care. Cigna alerted Sandy to the lack of an assessment on the day of its expedited appeal decision and offered to send a list of psychiatric providers. In the meantime, it relied on the only available records—those from Diamond Ranch Academy. Cigna did not need to request additional records that did not yet exist. Cf. Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 804 (10th Cir. 2004) ("[N]othing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists."). Cigna's denial did not violate ERISA regulations.

Lastly, Sandy argues that Cigna failed to engage in a "meaningful dialogue" regarding M.W.'s and Colby's claims because it ignored the substance of her appeals. (Mot. at 27.) But again, her argument finds no support in the record. Certainly claim administrators "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." Gaither, 394 F.3d at 807. Here, however, Cigna considered all available information for both claims and found that M.W. and Colby did not need residential treatment under the terms of the Plan. Cigna also regularly communicated its findings and decisions with Sandy, and did so in a timely manner. In sum, the record reflects Cigna's "fair and accurate assessment" of Sandy's claims, Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1324 (10th Cir. 2009), and substantial compliance with ERISA's procedural regulations.[3] Gilbertson, 328 F.3d at 635.

The court finds that Cigna substantially complied with ERISA's procedural requirements for claims for both children. Accordingly, because the Plan gives discretionary authority to the administrator, the court applies the abuse of discretion standard of review.[4]

---

[3] The Tenth Circuit has not yet applied the substantial compliance test articulated in Gilbertson to the ERISA claims procedure regulations as amended in 2000. Sandy urges the court to reject the substantial compliance test and instead follow the Second Circuit, which adopted a stricter test in the wake of the amendments. See Halo v. Yale Health Plan, 819 F.3d 42, 56–59 (2nd Cir. 2016). But this court has declined to follow Halo, and will again decline to do so here. See Brian C. v. ValueOptions, No. 1:16-cv-93-DAK, 2017 WL 4564737, at *3 (D. Utah Oct. 11, 2017).

[4] The court will review for abuse of discretion regardless of MES' external appeal decision. Sandy, citing K.F. ex rel. Fry v. Regence Blueshield, No. C08-0890-RSL, 2008 WL 4223613 (W.D. Wash. Sept. 10, 2008), asks the court to separately review MES' affirmance of Cigna's denial de novo because, she contends, the Plan only granted discretionary authority to Cigna as the claim administrator, not MES. But the Fry decision has not been followed even within the Ninth Circuit, and the court declines to follow it here. See Peter B. v. Premera Blue Cross, No.

# ANALYSIS

Cigna denied M.W.'s and Colby's claims for benefits for the same reason—because it determined that residential treatment was not medically necessary for either child under the terms of the Plan. The court finds both decisions to be reasonable and supported by substantial evidence.

## Cigna's Denial of Benefits for M.W.'s Residential Treatment was Reasonable

On its initial review of M.W.'s claim and on appeal, Cigna concluded that M.W. did not satisfy part 2-A of the Plan's criteria for residential admission, which provides:

> The child/adolescent has been diagnosed with a severe psychiatric disorder that is pervasive and significantly impairs developmentally appropriate functioning. This impairment in function is seen across multiple settings such as: school, home, and in the community, and clearly demonstrates the need for 24-hour supervision and active treatment . . . .

(Admin. R. at Plan 175.)

Substantial evidence in the record supports Cigna's determination. To be sure, M.W. had a troubling history and ongoing behavioral problems that warranted treatment. MES, affirming Cigna's denial, stated that M.W. "cannot live with his family."[5] (Id. at MW 104–05.) But upon admission, M.W. was not behind in school. Dr. Roby's psychological assessment noted that

---

C16-1904-JCC, 2017 WL 4843550, at *2 (W.D. Wash. Oct. 26, 2017) (declining to follow Fry in light of subsequent Ninth Circuit case law); see also Lyn M. v. Premera Blue Cross, No. 2:17-cv-01152-BSJ, 2018 WL 2336115, at *6 (D. Utah May 23, 2018) (additionally recognizing that following Fry "would have the drastic effect of virtually eliminating the potential for Firestone deference anywhere in the United States because the Affordable Care Act now mandates an IRO review process for all health plans offered in the United States").

[5] MES' statement does not by itself satisfy part 2-A of the medical necessity criteria. (See id. at Plan 175.) The Plan also notes that residential treatment "cannot be considered a long-term substitute for lack of available supportive living environment(s) in the community." (Id. at Plan 174.)

M.W.'s problematic behavior was "serious" and recommended residential treatment because it would "most easily" facilitate therapy and provide a predictable environment. (Id. at MW 502–03.) But Dr. Roby did not classify M.W.'s behavioral problems as "severe," nor did he conclude that residential treatment was necessary. Likewise, M.W.'s resulting treatment plan, which prescribed various therapies to address his oppositional defiant disorder and anger management problems, did not indicate that M.W.'s condition was severe enough to require residential treatment. And Dr. Blank's initial review of Diamond Ranch Academy's records noted that M.W.'s only acute symptoms were periodic anger on the phone with his mother and irritation with his classmates.

The record further demonstrates that Cigna (and then MES) considered Sandy's appeal—both her arguments and her recitation of M.W.'s history of behavioral problems and treatment. Sandy contends that Cigna ignored her appeal and "failed to 'come to grips' with the reality of [M.W.'s] problems and his need for secure and structured treatment." (Mot. at 33 (quoting Gaither, 394 F.3d at 802).) But Dr. Qayyum noted M.W.'s past diagnoses, treatments, and hospitalizations, as well as Sandy's narrative history of M.W.'s behavioral problems. He disagreed with Sandy's conclusion that M.W. needed residential treatment, but that is not to say he ignored her appeal. As this court recently noted in a similar case, "[a] disagreement in the application of the correct criteria does not equate to a failure to consider Plaintiffs' arguments." Brian C., 2017 WL 4564737, at *3.

Sandy also contends that Cigna's denial was arbitrary and capricious because it failed to analyze part 2-B, an alternate basis for admission when "[i]mmediate prior treatment in a more intensive level of care (such as mental health inpatient) has resulted in an acceptable degree of

stability[] [but] the child/adolescent continues to display behaviors that require around-the-clock supervision in a structured setting . . . ."  (Admin. R. at Plan 175.)  Part 2-B simply does not apply here.  M.W. had not undergone more intensive treatment immediately before his admission to Diamond Ranch Academy.  While he had been hospitalized for behavioral problems, those hospitalizations occurred between 2005 and 2009, well before his 2013 admission to Diamond Ranch Academy.  Cigna did not need to consider M.W.'s eligibility under the provision.

Cigna reasonably determined that M.W.'s behavioral problems were not severe enough to necessitate residential treatment.  The court finds Cigna's decision to deny benefits was not arbitrary and capricious.

**Cigna's Denial of Benefits for Colby's Residential Treatment was Reasonable**

As with M.W., the court that finds Cigna's decision to deny coverage for Colby's treatment at Diamond Ranch Academy was reasonable.  Cigna's decision stemmed primarily from the absence of a psychological assessment supporting the need for residential treatment.  The Plan specifically listed such a consideration for admission—whether "[p]rior to admission there has been a face-to-face assessment . . . to determine if this level of care is medically necessary and clinically appropriate."  (Admin. R. at Plan 174.)  Cigna validly based its denial of coverage on the lack of such an assessment.

Moreover, Cigna's decision—though it predated Colby's psychological assessment—was supported by substantial evidence.  Sandy admitted Colby to Diamond Ranch Academy in part because police told her Colby was suicidal, and in part because she believed Colby was "killing herself with alcohol use and drug addictions."  (Id. at CW 47.)  But Colby's Diamond Ranch Academy records indicated no risk of self-harm, and she was removed from suicide watch the

day after her admission.  Cigna physicians reviewed these and other available records, spoke

with a Diamond Ranch Academy social worker, and offered to cover a lower level of treatment

(which Diamond Ranch Academy did not provide).

MES' external review further supports Cigna's decision.  MES considered Dr. Roby's

psychological assessment of Colby, Sandy's narrative history of Colby's drug and alcohol use

and behavioral problems, and additional records from Diamond Ranch Academy.  Even with the

benefit of these additional records, MES found that Colby did not meet the medical necessity

criteria.  Diamond Ranch Academy records "did not point towards any clinically significant

depression or anxiety."  (Id. at CW 36.)  And while Colby did need therapy and medication

management, she could receive such treatment on an outpatient basis.  Sandy could also avail

herself of community-based interventions to address Colby's substance use before resorting to

residential treatment.   Indeed, Dr. Roby's assessment recommended residential treatment only

because it would "most easily" facilitate treatment.  (Id. at CW 74.)  The Plan's medical

necessity criteria, however, require a greater justification "than the convenience of the provider .

. . ."  (Id. at Plan 173.)  MES' affirmance, like Cigna's initial decision to deny coverage, was

based on a reasonable reading of the medical necessity criteria and supported by substantial

evidence.

**<u>ORDER</u>**

For these reasons, the court DENIES Sandy's Motion for Summary Judgment (ECF No. 22). The parties shall bear their own fees and costs. The Clerk of Court is directed to close this case.

SO ORDERED this 27th day of August, 2018.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge